# Basset and Haydon *vs* Bowmar, &c.

### APPEAL FROM THE HENRY CIRCUIT.

*Executions.    Return.   Sheriff.*

JUDGE MARSHALL delivered the opinion of the Court.

MOTION.

*Case* 91.

*April* 24.

The facts and grounds of the motion.

THIS appeal is prosecuted by Basset and Haydon, to reverse a judgment of the Henry Circuit Court, dismissing their motion, brought against Bowmar, Sheriff of Woodford county, and his sureties, to recover the amount of an execution in their favor and thirty per centum damages thereon, for a failure to return it within the time prescribed by law. The execution was for about $1900, with some interest and costs, in favor of Basset and Haydon against McConathy and Taylor, and was issued from the Henry Circuit Court, on the 17th of December, 1840, directed to the Sheriff of Woodford county, returnable on the first Saturday of February, 1841; after which one month was allowed by law for its return, before the penalty denounced for a failure would be incurred.

It appears that Haydon, one of the plaintiffs, took the execution from the county of Henry to that of Woodford, and that C. M. Mathews, (a witness,) went with him to ascertain whether the debt could be made out of the estate of Taylor. And it may be assumed not only that

they knew before they went, that there would be difficulties in the way of making any thing out of Taylor, if indeed it should be at all practicable, but also that they considered the prospect of making any thing out of McConathy still more desperate. On their arrival at Versailles, in Woodford county, they were informed by Blackburn, the deputy Sheriff, and by Kinkead, an attorney whom they consulted as to the prospect of making the money out of Taylor, that he was considered to be insolvent; that executions against him had been returned by the deputy Sheriff, "no property;" that the property in his possession was mortgaged, &c. and otherwise encumbered, and that there was no chance of making any thing out of him unless the conveyances could be set aside as fraudulent. This was the conclusion of all parties, and Haydon left the office of the attorney, where the deputy Sheriff was when this conclusion was adopted, with an agreement that the attorney should examine the conveyances, and if he should be of opinion that they could be successfully attacked, he should do so; otherwise the plaintiffs *did not wish to be put to further expense.* This fact is stated by Kinkead, who also says, that having afterwards examined the conveyances and the law, he wrote to the plaintiffs that he had doubts as to the result of an effort to set aside the deeds, but that for a large contingent fee he would attempt it, and that he heard nothing further from them. This letter, as the bill of exceptions states, was in possession of the plaintiffs' counsel in Court, but they refused to let Kinkead examine it.

The witness, Mathews, states that while in the office of Kinkead, the execution was handed, *by himself or Haydon,* to the deputy, Blackburn, and he was directed by them to make the money *if possible;* that he took the execution and remarking, that he thought Taylor was insolvent, and that he had returned several executions against him "no property," said he would do his best to make the money, as the amount would pay him well if he should succeed.

It appears that a previous motion, returnable to April, 1842, had been made against the defendant; and the witness, Kinkead, says that after that motion had been made,

BASSET &c.
*vs*
BOWMAR &c.

he had urged young Blackburn, son of the deputy, and also the deputy himself, to look among the papers of the latter for the execution; that he had hunted among his own papers and could not find it. He does not recollect that Haydon put the execution particularly under his control.

The son of the deputy stated, that according to Kinkead's instructions, he examined his father's papers with his father, for said execution, but they could not find it; and that this examination must have been made some time the last of February or first of March, 1841; that he was attending the law lectures in Lexington, which enabled him to fix the time, and that he never saw the execution. The execution was never returned.

The statute under which this motion was made, (*Stat. Law*, 626,) places the right of recovery upon the Sheriff's failure, neglect, or refusal, "without good cause," to return an execution within the time prescribed. The statute is one of a highly penal character, and its enforcement in a case in which the failure of the Sheriff has been a mere casual omission or even neglect, without any appreciable injury to the plaintiff in the execution, and without any sinister motive on the part of the Sheriff, who, by the insolvency of the debtor, will be without remedy for the loss to which he may be subjected, neither appeals to that sense of justice by which ordinary claims between individuals may be tested, nor derives any aid from it. Such an attempt to throw a loss, already incurred by the plaintiff, upon a party whose omission has neither profited himself nor injured the plaintiff, resting as it does upon the naked letter of the statute, must always encounter a strict construction, both of the statute, the law on which the case is founded, and of the evidence by which it is attempted to be made out.

*Statutes which are penal in their character should be strictly construed, and the evidence to make out the case, whereby the penalty is to be enforced, strictly scrutinized.*

The statute certainly implies that the execution must have come to hand while it was in force, and that there was reasonable time for action upon it, and the failure to return it, must be "without good cause." What that cause may be, the statute does not attempt to define, and it must depend upon the circumstances of each case. But it must be some cause, which, affecting either the

*Execution must be returned by the Sheriff within one month, "without good cause" intervene—must not arise from negligence' or be intentional.*

Basset &c.
vs
Bowmar &c.
power or the duty of the Sheriff to return the execution, forms a reasonable excuse for his failure to do so. His duty to make the return could not, while it was in his power to make it, be affected by his own act; but as his power or ability might be, it is a necessary qualification of the excuse, arising from want of power or ability, that it should not have been produced by his own intentional act, or by that degree of negligence which should be deemed equivalent to wrongful intention.

The case of *Waring vs Thomas,* (1 *Litt.* 253,) and *Ross vs Thomas,* (1 *J. J. Mar.* 600) and *Danforth vs Oglesby,* (*MSS opinion, Spring term,* 1842,) cited and examined.

In the case of *Waring* vs *Thomas,* (·1 *Littell,* 253,) the execution was mislaid and could not be found, and this circumstance, which in itself implied some degree of negligence, was deemed a sufficient cause within the act. In the case of *Ross* vs *Thomas,* (1 *J. J. Marshall,* 600,) the Sheriff, knowing the plaintiff personally, and supposing his first name to be Johnston, when his name was Joseph, as appeared by the execution itself, addressed the letter containing the execution, to Johnston Ross, instead of Joseph Ross. But this mistake, which would have been avoided had the Sheriff looked into the execution in his hands, being accounted for, and being an innocent one, was deemed by the Court a sufficient excuse for the misdirection and failure to return, if there were a failure; it being held unnecessary that the Sheriff should have looked into the execution, as he found no property to levy on, and knew the plaintiff personally, and believed he knew his name. In the case of *Danforth* vs *Oglesby,* (*manuscript opinion, Spring term,* 1842,) the Sheriff passing from his office to the Clerk's office, in the same town, with several executions in his hand for the purpose of returning them to the Clerk's office, was casually stopped by the way, and having laid the executions, one of which was afterwards the subject of the motion, under a book in the room where he stopped, did not think of them when he went away, and afterwards supposed that he had in fact returned them, or at least the one in question, and this was deemed a sufficient, cause or excuse for his failure.

If the failure to return an execution by the Sher-

These cases seem to establish the principle which is, in effect, declared in the case of *Thompson* vs *Ross,* that if the failure to return an execution be occasioned by

such casualties, or inadvertences, or mistakes, or omissions, as men of ordinary prudence are subject to, and there has been no improper motive in the case, a good cause is made out under the statute.    In the two last of these cases, and perhaps in the first, the defendants in the executions were insolvent—and we are not prepared to deny that, when this circumstance exists and is known to all parties, and when, so far as appears, the non return of the execution has not, and could not have injured the plaintiff, and its actual return would neither afford any information nor secure any advantage to him, these circumstances should be entitled to some weight in determining as to the sufficiency of the cause of the failure to return. For as in such a case the attention of the Sheriff would be less strongly called to the execution, while actually in force, it would be more subject to casualties, and he as a man of merely ordinary prudence and diligence, would be more subject to inadvertences and omissions, which might put it out of his power to make return of it, than if it were an execution on which he either had made or was proceeding to make the money, or had any prospect of making it, or on the return of which any right or even expectation of the plaintiff could have depended, and as slighter diligence would be expected or required in attending to the commands of the execution in the former than in the latter case, it would seem to follow that a slighter excuse for a failure to return, might also be deemed sufficient.    It is to be remarked too, in favor of this conclusion, that the statute itself, by uniting inseperably the recovery of the debt with the recovery of the thirty per cent. damages thereon, furnishes some ground for the inference that it was passed mainly with a view to those cases in which the safety of the debt might be affected by the failure to return the execution.    But if the mere fact of the immateriality of the return to any interest of the plaintiff, should constitute no sufficient ground for relaxing the diligence of the Sheriff in performing that duty, or the rigor of the law in enforcing it, or in punishing its breach, can it be justly said that when, in addition to that fact, it appears that the conduct of the plaintiff in the execution has been such as to lull the vigilance of the

iff arise by such casualties, inadvertences, mistakes or omissions, as men of ordinary prudence are subject to, and there has been no improper motive in the officer, a "good cause" is made out—reasons for this rule.

It is not the object of this statute to authorize or encourage creditors to make the debts due from insolvents, by taking advantage of the inadvertences of officers.

Sheriff, or to weaken his sense of the duty and responsibility imposed by law, such conduct being calculated to throw him off his guard, should not be deemed, of itself, a sufficient excuse under this highly penal statute, for a failure, uninjurious and unintentional, and which appears to have been the consequence of mere inadvertence, though there be no proof of actual loss of the execution.

It is undoubtedly a high policy of the law to compel diligence and punctuality in the performance of the duties attached to the office of Sheriff, and especially of this duty of returning executions; and as the enforcing of punctuality in returning executions is a most efficient means of insuring diligence in acting upon them, and punctuality and fidelity in paying over what may be made, it may be presumed that the attainment of these objects was the principal motive for denouncing the heavy penalty against a failure to return an execution. But it is contrary to the policy as well as the justice of the law, that the judgment creditors of insolvent debtors, utterly hopeless of making their debts in that direct mode which it is the object of this statute to render efficient, should be encouraged or permitted to calculate upon the inadvertences to which the infirmities of human nature may subject any individual of ordinary prudence, as a regular mode of making themselves whole at the cost of the Sheriff. And we deem it to be not only consistent with the true spirit of this statute, but essential to its proper administration, to guard it against the perversion to which it must be subject, if it were allowed such an operation as might induce creditors, in cases otherwise hopeless, to speculate upon the liabilities which it imposes on Sheriffs. When, therefore, in such cases, it appears that the creditor has so acted as to lull the vigilance of the Sheriff, or to throw him off his guard in any degree, with respect to his legal duties and responsibilities, we are clearly of opinion that he thereby furnishes an excuse for any mere inadvertence which, under this statute, should be regarded as a sufficient cause for a merely inadvertent failure to return an execution. The Sheriff being engaged in numerous transactions, and especially in the execution of numerous precepts requiring diligent punctuality and con-

stant action of mind and body, it is easy to conceive that when, by the act of the plaintiff, in any of these precepts, he is induced or authorized to relax in his diligence and attention with regard to that precept, he has no longer the same motive for recurring to it, or the same power of doing so, as if he had been left to the duty of constant and active attention to it which the law imposes; and when he has the precept to be acted upon only when further directions shall be received, which directions are never given, we think that a failure, from mere inadvertence, again to recur to it, and a consequent failure to return it, is not such a failure, "without good cause," as will subject him to the penalties of this statute.   This conclusion, which is conformable with the case of *Shannon* vs *Clark*, (3 *Dana*, 155,) is in our opinion, fully supported by the other cases above referred to, the obvious principle of which is, that excusable negligence or inadvertence, that is, such as is consistent with ordinary diligence, is itself an excuse within this statute.

After these remarks upon the principles which should govern the case, a brief recurrence to the facts, deducible from the evidence, will suffice.

It may, we think, be fairly assumed, that it was understood by all parties, that nothing could be made upon this execution, and that nothing should be done unless Kinkead should be of opinion, upon examination, that the conveyances of Taylor's property could be successfully attacked, and that Blackburn was not expected to act upon it until advised to do so by Kinkead.   And it does not appear that Blackburn was ever directed afterwards to act upon it, either by the plaintiff or by Kinkead, to whom some control over it was obviously given.

From this failure to urge any proceeding on it, or from the failure of the plaintiffs to answer Kinkead's letter, the inference fairly arises, that they had no intention that it should be acted on.   The refusal of their counsel to permit Kinkead to recur to this letter during his examination as a witness, not only strengthens this inference against them, but as Kinkead's recollection was evidently at fault with regard to several minor circumstances, otherwise sufficiently established, this refusal gives rise to

*Circumstances in the proof in this case calculated to put the Sheriff off his guard, and furnish good excuse for the failure to return the execution.*

the further inference, that a recurrence to the letter might have awakened his recollection of other circumstances unfavorable to the plaintiffs. But waiving this inference, there was enough in the understanding that the execution was not to be levied without further directions, and in the failure to give any further directions, to relax the Sheriff's diligence and attention in regard to it, and to excuse, in view of this statute, his failure to return it, if attributable to mere inadvertence ; or if, as the evidence conduces to prove, the execution was lost before the return day, so that it could not in fact be then returned, the loss, if attributable to mere inadvertence, which the circumstances first referred to are sufficient to excuse, would bring the case clearly within that of *Waring* vs *Thomas*, and must be deemed a good cause under the statute. There is no ground for imputing the failure of the Sheriff to fraud, collusion, or any selfish motive, nor is there any other proof of negligence, but that which is implied, either in the loss of the writ, or in the omission to return it if not lost. And as neither the loss nor the omission to return, necessarily imply gross negligence, we shall not presume such negligence, when, as has been shown, the conduct of the plaintiff and other circumstances already noticed, were calculated to relax the diligence and attention of the Sheriff in regard to this execution, and thus to produce such inadvertence as would furnish an excuse or good cause under the statute.

Having based this result as well upon what occurred between the parties on the occasion when the execution was placed in the Sheriff's hands, as upon the known insolvency of Taylor, the hopelessness of making any thing out of the execution, and the actual unimportance of its being returned, we deem it proper to say, that whatever effect the directions given the Sheriff, and the conversation then had might have been entitled to, if nothing further had occurred between the parties, it is apparent from the bill of exceptions, that it was after this conversation, that upon particular conference with the attorney, the conclusion was adopted by all parties, that nothing could be made out of Taylor unless his conveyances could be set aside as fraudulent, and that unless

.the attorney should, upon examination, be of opinion that this could be done, no further expense was to be incurred. As under this conclusion Blackburn could do nothing of himself towards subjecting the property, the previous directions to him, and his own promises, were thereby annulled or referred to the contingency of a future determination of the plaintiffs or the attorney, to attack the conveyances, which contingency never happened.

With regard to the apparent discrepancy between the statements of Kinkead and young Blackburn, as to the time when ineffectual search was made for the execution, a discrepancy which involves neither the veracity nor character of the witnesses, but merely the accuracy of their recollection as to the time when Kinkead gave instructions for the search. We may further remark, that if it were essential to the result of this case to establish the loss of the execution as the cause of its non-return, and to fix the search within the period in which it might have been returned, we do not know that we could disregard the positive statement of Blackburn, upon whose mind the search itself, as well as the circumstance to which he refers, as enabling him to fix its date were calculated to make a strong impression; and especially, when as already intimated, Kinkead seems to have retained a very imperfect recollection of incidental or collateral circumstances. He did not recollect that either Mathews or the deputy, Blackburn, was in his office when he had the interview with Haydon, or that he saw the execution on that occasion.

But the view which has been taken of the circumstances in the case, dispenses with the necessity of a further analogy of this part of the evidence. And we will only add, that the search made by Kinkead among his own papers, tends to show that there was at the time some impression on his own mind that the execution, over which he certainly had some control, may have been delivered to him either by the plaintiff, Haydon, or by the Sheriff, and this inference, coupling itself with the refusal to permit him to examine his letter written to the plaintiffs in relation to the collection of this debt, seems calculated to involve in some doubt the most important

Opinion of the
Court and man-
date.

facts on which this attempt to enforce the penalty of the statute is founded.

Upon the whole case, therefore, we are of opinion, that if the plaintiffs have sustained any injury from the failure to return the execution in this case, (which however does not now appear,) they should seek a redress commensurate with the injury, for which the law affords them ample remedy. They have not, as we think, made out a case which requires this Court to set the first precedent of adjudging the penalties of this statute, for the non-return of an execution against insolvent debtors.

Wherefore, the judgment is affirmed.

*Owsley & Goodloe* for appellants: *Morehead & Reed* for appellees.